# CHARLESTON.

STATE *ex rel.* R. L. BLACK *et al.* *v.* STATE ROAD COMMISSION *et al.*

(No. 6612)

Submitted October 16, 1929.   Decided October 22, 1929.

42

*Henry S. Cato,* for relators.

*Howard B. Lee,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for respondents.

MAXWELL, JUDGE:

Section 72 of the Standard Specifications prescribed by the State Road Commission for state road construction contains the provision that "stone exceeding three (3) inches in its largest diameter shall not remain within three (3) inches of the completed surface". Relators entered into a contract with the commission for the grading of project No. 3285-C of approximately 30,200 feet in length. The proposal and contract of the relators was to do the work in accordance with the plans which had been prepared therefor, and in accordance with the Standard Specifications. The plans and specifications were made part of the contract. Relators say that in order to comply with the above quoted requirement of the Standard Specifications, it was necessary for them to remove 4248 cubic yards of rock and dirt beneath the line of the crown of the road, and that after the removal of this material it was necessary to "back fill" with material suitable for the purpose. They seek a mandamus to compel the division engineer to certify for payment a final estimate covering the amount of material thus removed, at the contract price of 44c per cubic yard for classified material, amounting to $1,869.12, and to

require the members of the State Road Commission, upon the making and filing of such estimate by the division engineer, to execute a requisition upon the auditor of the state for the payment of said sum. Other items were at first involved in this proceeding, but they have been eliminated.

Section 32 of the Standard Specifications reads: ''Work done without the lines and grades given, work done beyond the lines and grades shown on the plans or as given, except as herein provided, work done after a suspension has been ordered, or any extra work done without written authority will be considered as unauthorized and at the expense of the contractor and will not be measured or paid for by the Commission. Work so done may be ordered removed or replaced at the Contractor's expense.'' On the plan for the job undertaken by the relators there is portrayed a typical cross-section of the road as proposed to be graded. This cross-section clearly shows the crown or finished grade of the road but does not show a horizontal line across the radius of the road indicating a maximum pay line in rock cuts. Relators are not entitled to pay for excavation made below the crown of the road unless their contract provides therefor or unless it was outside the terms of the contract and they were required to perform the extra service by an authorized representative of the State Road Commission. In the light of the provisions of the above quoted section 32 of the Standard Specifications and in the further light of the cross-section of the road appearing on the plans, as above indicated, the contractors must be held to have undertaken to complete the grading of the road in accordance with standard requirements and to receive pay on the basis of measurements determined by the contour of the crown of the road. Excavation below the crown of the road and the removal of stone therefrom and ''back filling'' was an incident of the main undertaking to complete the road to the grade of the crown. Of course, if the plans had portrayed a horizontal line below the crown of the road as the maximum pay line in rock cuts, the situation would be different; but it was wholly within the province of the road commission and the relators to enter into a contract for the grading of the road in accordance with plans and Standard Speci-

fications `without making provision for compensation for removing materials below the crown of the road. The contractors may have thought that they were to receive pay on the basis of unclassified excavation for work done below the crown of the road, but we must look to the contract and the plans for a final determination of what they undertook to do and for the basis of their compensation.

One of the relators testifies that the work done under the item now involved in suit was at the direction of E. N. Blackwood, who was the inspector on the job and for at least a part of the time was acting assistant district engineer. Mr. Blackwood says that he did not direct that the material be removed below the grade of the crown of the road, but that he did call to the attention of the contractors the provisions of section 72 of the Standard Specifications requiring that no stone exceeding three inches in the largest diameter be permitted to remain within three inches of the completed surface. In our opinion it is unimportant just what construction be placed on the communication from Blackwood to the contractors, whether it be deemed to have been an order or direction to remove the stone within three inches of the surface of the road, or whether it be considered to have been a mere reminder of the requirements of the Standard Specifications with reference thereto. The removal of that stone was a contract matter. The relators had undertaken to do that very thing. Were they entitled to pay for it by the cubic yard, or was it an incident to the work for which estimates were made by the engineer and compensation paid by the State Road Commission? We have already indicated that under the terms of the contract, the latter proposition must be considered to be the correct one.

After the work had been completed B. G. Etchison, Assistant Division Engineer, reported to the commission that the relators should be paid for the 4248 cubic yards of rock cut excavation, but the commission declined to act in conformity therewith. Relators say that the commission should have acted in conformity with the report; that there then remained for the commission, after accepting the road, merely the ministerial duty of paying the contractors the amount ap-

proved by the engineer. In support of this position sections 52 and 62 of the Standard Specifications are relied upon. They quote a part of 52 and all of 62 as follows:

Section 52. "The Engineer shall decide * * * all questions as to the acceptable fulfillment of the contract on the part of the Contractor; and the Engineer shall, determine the amount and quality of the several kinds of work performed * * * which are to be paid for under the contract and such decision and estimate shall be final and conclusive * * *."

Section 62. "Whenever, in the opinion of the Engineer, the Contractor shall have completed the roadway in an acceptable manner in accordance with the terms of the contract, the Commission shall cause to be made a final inspection of the entire roadway and if found satisfactory shall enter an order accepting the same. The final estimate shall then be made by the Engineer within thirty days of the date of the said order of acceptance or as soon thereafter as practicable, and the Contractor paid the full amount due."

Whatever may be the effect of a division engineer's report under said regulations as to the character of the work done, it cannot be said that the commission is thereby precluded from asserting its interpretation of the contract with reference to the basis of the compensation to the contractor. Our case of *Draper* v. *Anderson et al.,* 102 W. Va. 633, relied on by relators, does not sustain the position of relators in this particular. It is there held "that * * * the Road Commission may be compelled by mandamus, at the instance of the contractors in cases not involving a substantial controversy of fact, to issue a requisition upon the auditor for labor performed by them in the construction of a state road under a contract with the State, by the Road Commission." Clearly, the "labor performed by them * * * under a contract" there referred to, is labor for which the contractors are to be paid under the terms of the contract,—not labor as to which there may be a legal question as to whether the contract con-

templates compensation to the contractors. The *Draper* case only went to the extent of holding, as declared in syllabus one, that "The performance by public officials of a plain legal duty, not involving the exercise of discretion or judgment on their part, may be enforced by writ of mandamus." The converse is necessarily true. Where there is not a plain statutory duty to be performed mandamus will not lie. There is no duty, statutory or otherwise, devolving upon the commission to pay for work for which it did not contract to pay, or which, not being under the terms of a contract, was not performed under direction or order of an authorized representative of the commission as extra work. The situation is in no wise controlled by a recommendation of one of the commission's engineers that the work should be paid for. Such recommendation does not affect the contract.

"Since the purpose of a writ of mandamus is not to establish a legal right but to enforce one which has already been established, the legal right of plaintiff or relator to the performance of the particular act of which performance is sought must be clear and complete." 38 C. J. 582. A doubtful or substantially disputed right will not be enforced by mandamus. Idem, p. 585. The writ is never issued in a doubtful case. "Clear legal right of the relator in mandamus to have performance of the act he seeks to coerce performance of, and plain duty to perform it, on the part of the respondent, are essential to the award of the writ." *Smith* v. *County Court*, 78 W. Va. 168. Under these well settled principles the writ could in no event be awarded in the instant case. The most liberal concessions to the relators would involve a question of doubt.

*Writ denied.*

LIVELY, PRESIDENT, concurring (on petition for re-hearing):

The gist of relators' claim to mandamus is that, under the contract plans and specifications, they were compelled to remove 4248 cubic yards of rock and dirt below the line of the crown of the road, and then back-fill the excavation with suitable material; therefore, it was a ministerial duty of the division engineer to certify that excavated yardage at 44c

per cubic yard in favor of relators to the Commission, and the ministerial duty of the latter to pay therefor. The opinion is based on the contract, section 32 of the Standard Specifications and the cross-section appearing on the plans, and correctly holds that the contractors undertook to complete the grading and receive pay therefor on the basis of measurements determined by the contour of the crown of the road. The opinion correctly holds further that the final estimate of the division engineer of work done does not estop the Commission from refusing to pay for items therein contained, which are not authorized by the contract, specifications and plans. Otherwise, the Commission would be a ''rubber stamp'', and would be bound by what the engineer conceived the contract to be. No such power was ever intended to be lodged in the engineer. In the Commission is placed plenary power in the construction and maintenance of state roads by the act creating it, defining its powers and duties, and not in its agents, servants and employees. In the brief filed for rehearing it is argued that Blackwood, claimed by relators to be the engineer on the project, ordered relators to excavate the material here in controversy, when he called Black's attention to the Standard Specifications. Blackwood says he was not the engineer on the job, that he was the inspector, and did not as such *direct;* that his duty as such was to supervise the completion and see that any defect was remedied; that when the contract and plans are departed from, it is the inspector's duty to have corrections made. His statement is to this effect, that the excavation here sued for was not done at his direction. If the excavation was within the contract, as here claimed, why should the inspector be asked if that work should be done? Was it then a matter of doubt under the contract? The contract, Standard Specifications and plans speak for themselves. They form the contract, what shall be done by the contractor, and when done in accordance therewith what the Commission shall pay. The issue here is whether that contract includes the excavation sued for as unclassified, and whether the excavation was directed to be done by the Commission through its engineer, and, as above stated, falls within that contract. It must be remembered

that this is a mandamus proceeding, and not an ordinary suit at law for breach of contract; and as pointed out in the Court's opinion, the relators must show a clear legal right to have a ministerial act performed; or if respondent has discretion to do the act required, then it must be clear that the refusal is arbitrary or wilful. The most that can be said of relators' claim under the contract and the evidence is that their right to have the engineer make a final estimate so as to include the 4248 cubic yards involved and certify the same to the Commission, and to require the Commission to pay for it as unclassified material, is of such doubt that the extraordinary and harsh remedy of mandamus will not lie. Had the case been tried by a jury and questions of fact determined by it and under proper instructions, we would not be disposed to disturb a finding either for relator or the Commission. In *Draper* v. *Anderson*, 102 W. Va. 633, cited in the opinion and dissent, the refusal of Anderson, the division engineer, to certify the yardage removed by the contractor under and covered by his contract was the result of a controversy between the contractor and West, the engineer in charge of the work, which degenerated into a fight between them, West receiving a severe trouncing. The refusal to certify was arbitrary, and the motive apparent. That case did not involve a substantial controversy of fact.

LITZ, JUDGE, (dissenting):

The decision, to my mind, is unsound in principle and at variance with the ruling in *Draper* v. *State Road Commission*, 102 W. Va. 633. The opinion brushes aside the doctrine of that case and proceeds to hold, by an unreasonable interpretation of the contract, that the contractor agreed to perform a substantial part of the work without compensation. According to this theory, in the language of the Court, "excavation below the crown of the road and the removal of stone therefrom and 'back filling' was an *incident* of the main undertaking to complete the road to the grade of the crown." The contract, after setting out the estimated yardage of unclassified excavation at 44c per cubic yard and other items of the proposed improvement, stipulates that the work

shall be performed in accordance with plans and specifications made a part thereof. "The Standard Specifications" of the State Road Commission (which also are a part of the contract), in section 72, provides: "All soft, spongy material and all muck, quicksand, and soft clay shall be removed to the depth required by the Engineer. The surface of the entire roadway shall be brought roughly to the subgrade line as given and sufficient selected material from the excavation placed thereon, if necessary, to bring the completed surface to the proper line, grade and cross-section. Stone exceeding three (3) inches in its largest diameter shall not remain within three (3) inches of the completed surface." Section 74 reads: "This work shall be paid for at the contract unit price per cubic yard of unclassified excavation, *measured in its original position,* excavated and disposed of in accordance with these specifications, and the limits shall not exceed those shown on the plans or fixed by the Engineer." By this provision, the Road Commission agreed to pay the contractor for all unclassified excavation, required by the contract or the engineer, *measured in its original position.* The clause, "and the limits shall not exceed those shown on the plans or fixed by the engineer," means the estimated cubic yardage, shown on the plans, or the yardage finally ascertained by the engineer to have been necessarily removed by the contractor in the performance of the work. The "Construction Manual" of the State Road Commission (of 139 pages of printed matter), "prepared as a guide for the construction staff" of the Commission, contains in section 56, 58 and 60 instructions to be followed by the engineer or inspector in ascertaining the yardage of unclassified excavation under the contract, as follows: "56. STRUCTURE BOOK. One of the most important duties of the engineer or inspector is measuring, calculating and recording the quantity of work done and the history of its performance. Records of this character are kept in the structure book. These books are issued to the inspector as required and are stamped on the cover with the project number and book number. The measurements of the contract quantities are to be recorded in this book. * * * 58. CONTRACT QUANTITIES. The structure book is also

the repository of the records, measuring and describing the pay quantities of work performed by the contractor. To arrive at the total number of units of work, the engineer or inspector must measure and describe by diagram or otherwise, all the pertinent facts necessary for their calculation. All these data are entered in proper form and order in the structure book, generally in accordance with the following more specific instructions. * * * 60. UNCLASSIFIED EXCAVATION. This class of work is paid for at the contract unit price per cubic yard, and the standard method of measuring the volume is by a system of original and final cross sections. For the roadway this volume is determined from the plan sections and final sections taken by the final survey party and recorded in separate books for that purpose. * * * The cross sections taken by the final survey party will show only the contour of the roadway after completion. This is sufficient to determine the volume of all the earth moved from the roadway only for a graded earth job and not always in this case. Wherever the roadway is cut through solid rock the excavation cannot follow the contour of the road as shown on the plans, for the rock is usually removed down to a level line at the elevation of the bottom of the roadway ditch, after which the section is shaped with a road machine. For this class of work the inspector shall enter a note with explanatory remarks showing the station to station limits of the work.''

On the second sheet of the ''Plan and Profile for the construction of'' the work, appears the following:

TYPICAL CROSS SECTION OF IMPROVEMENT

This diagram, as its title shows, represents merely a "typical cross section of the improvement," completed, and does not indicate any basis of measurement for the ascertainment of the unclassified excavation yardage for which the contractor is entitled to be paid. The decision, which ignores the express terms of the agreement (as I conceive them), is, nevertheless, based upon the absence from this irrelevant diagram of a "horizontal line below the crown of the road." The presence of such line, if of the significance claimed, would not show the maximum pay line. Although it might include the necessary excavation in rock, it would not do so in earth formation, containing "soft, spongy material and muck, quicksand and soft clay." Section 32 of "The Standard Specifications," quoted in the opinion, is without bearing upon the question involved. It, as disclosed by its title, deals with *"unauthorized work."*

The same form of contract and diagram were involved in the *Draper* case. This Court, in allowing the claim of the contractor for stone removed below the crown of the road, there said: "The yardage in question falls within two general classifications: (1) material removed below the original grade line; and (2) breakage beyond the slope line of the original specifications. Practically all of the excavation being through rock of irregular formation, commonly called 'bastard limestone,' it was necessary in obtaining a smooth grade to excavate below the grade line of the original specifications. * * * Numerous witnesses testified that it was necessary in the proper performance of the work to excavate, as was done, below the grade, in accordance with the grade stakes set by the engineers representing the Road Commission, some of which, attesting the fact, are still in existence." E. N. Blackwood, inspector on the job and acting engineer for a large portion of the time while the work was being performed, states that he advised the contractor that he was required under the contract to remove the stone and that it was removed under his direction and supervision, or, at least, under his inspection and supervision.